IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| LUANN BRADLEY, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 7:07-CV-0005-BF(R) |
| | § | ECF |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

In accordance with the District Court's Order (doc. 12), this is now a consent case before the United States Magistrate Judge. Plaintiff LuAnn Bradley ("Bradley") brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant, Commissioner, Social Security Administration ("Commissioner"), denying Bradley's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act. For the reasons stated below, the final decision of the Commissioner is affirmed.

### I. Background

**A. Procedural History:**

Bradley filed for DIB and SSI on May 23, 2003, with a protective filing date of May 14, 2003. She alleged disability since January 1, 2003 due to ear aches, chest pain, shortness of breath, a constant cough, dizziness, sharp pain in her left shoulder and lower back, asthma, and fluid in her ears. (Tr. 82.) The Commissioner denied Bradley's application initially and on reconsideration. (Tr. 39–52.) Pursuant to Bradley's request, a *de novo* hearing was held before Administrative Law

Judge Telea L. Gatewood ("ALJ") on July 14, 2005. (Tr. 19, 53.) Following the ALJ's decision denying Bradley's application, Bradley requested a review of that decision by the Appeal's Council. The Appeal's Council, however, denied Bradley's request. (Tr. 6–9.) After Bradley exhausted her administrative remedies, she filed this action.

## B. Factual History

### 1. Age, Work, Experience, and Education

Bradley is forty-nine years old and was born on August 18, 1958. (Tr. 27.) She was forty-four years old at the time she alleges her disability began and when she applied for benefits. (*Id.*) Bradley was forty-one when she was last insured for Title II benefits. (Tr. 79.) She has a high school education, and her prior jobs include: housekeeper/maid, laundry worker II, and fast food worker. (Tr. 27, 234–35.)

### 2. Medical Evidence

On February 15, 2002, Bradley saw Dr. Ramasamy Selvaraj at the United Regional Health Care System. (Tr. 128.) An x-ray was taken of her chest and compared with a prior x-ray taken on September 30, 1997. (Tr. 130.) There was no acute cardiopulmonary disease identified, and the x-ray was normal with the exception of the presence of a few calcified granulomas. (*Id.*) She was diagnosed with upper respiratory infection and Bronchitis, given medication, and permitted to return to work on February 17, 2002. (Tr. 128–31.) Then, three days later on February 18, 2002, Bradley saw Dr. Stuart Meyer, who was also with the United Regional Health Care System. (Tr. 122, 124–27.) After being treated for right upper quadrant pain and Tietze's disease, Bradley was given a release to return to work on February 20, 2002 without restrictions. (*Id.*)

Bradley was treated, on May 9, 2003, by Dr. Eva Horath for displacement lumbar intervert

disc without myelopathy, pain in the joint and shoulder region, and chronic airway obstruction. (Tr. 138.)  Dr. Horath referred Bradley for an x-ray of her left shoulder, which was taken on May 14, 2003.  (Tr. 133.)  There was no significant bone, joint, or tissue abnormality, except some faint calcification in the soft tissue, consistent with calcific tendinitis.  (*Id.*)  On May 15, 2003, Bradley was again treated for simple chronic bronchitis by Dr. Horvath.  (Tr. 139.)  She was seen on one other occasion by Dr. Horath for exacerbation of chronic bronchitis and bilateral wheezes; however, the date is unreadable.  (Tr. 134.)

Dr. Samuel Ajumobi, a non-treating physician employed by the Texas state disability determination agency, reported on Bradley's medical impairments on August 6, 2003.  (Pl.'s Br. 4.)  In his report, Dr. Ajumobi concluded that: (1) Bradley cannot lift, carry or handle objects weighing more than five to ten pounds, (2) she can stand for thirty minutes to one hour, (3) the motion of her left arm is limited to thirty degrees in abduction, while her right arm is normal, (4) her left arm strength is 1/5 and her right arm strength is 4-5/5, (5) she can walk without assistance, but is limited to one to two blocks due to pain, and (6) Bradley has no problem speaking or hearing. (Tr. 144.)  This report was based on Bradley's history and evidence obtained during an examination. (*Id.*)

On August 11, 2003, a disability pulmonary function exam was conducted by Dr. Gerald T. Bell. (Tr. 145.)  At this exam, Bradley's height without shoes was 59.8 inches. (*Id.*)  The predicted normal values for Bradley's forced vital capacity ("FVC") and one second forced expiratory volume ("$FEV_1$") were 2.92 and 2.28, respectively. (*Id.*)  Before bronchodilators, Bradley's FVC was 2.32, and her $FEV_1$ was 1.67. (*Id.*)  Bradley's pre-bronchodilator $FEV_1$ was seventy-three percent of the predicted normal value. (*Id.*)  Finally, her $O_2$ level was ninety-six percent on room air. (*Id.*)

On October 26, 2004, Dr. Hector Decena performed a psychiatric evaluation of Bradley. (Tr.

163–64.) Bradley complained of "primary and secondary insomnia, mood swings, crying spells, rapid and racing thoughts, anxiety attacks, and constant fear and fatigue." (Tr. 163.) Dr. Decena noted that Bradley was "oriented to all three sphere. Patient's memory appeared to be intact for both recent and remote events. Patient appeared to function in the average range of intelligence. Concentration was fair. Insight and judgment were intact." (Tr. 164.) Dr. Decena diagnosed Bradley with bipolar I disorder without psychotic features and panic disorder without agoraphobia. (*Id.*) Bradley was rated forty-seven on the Global Assessment of Functioning ("GAF")[1] scale, with a GAF rating of fifty-five for the previous year. (*Id.*) He prescribed Zoloft for depression and panic episodes and Depakote for a mood stabilizer. (*Id.*)

The transcript indicates that Bradley met with her mental health case coordinator, Lena Cummings, on four occasions between November 2004 and May 2005. (*See* Tr. 160–199.) Also included in the transcript is a record of the physician's orders, listing the dates medication was prescribed. (Tr. 165–66.) The transcript does not include specific meetings between Bradley and Dr. Decena other than the initial evaluation.

On February 21, 2005, Bradley was treated by Dr. Samir Atieh. (Tr. 185.) Dr. Atieh diagnosed Bradley with COPD, right ear pain, and hypothyroidism. (Tr. 185–86.) Dr. Atieh also noted Bradley had depression and bipolar disorder. (*Id.*) Dr. Atieh also ordered an abdomen sonogram for Bradley. (*See* Tr. 187.) Dr. Klonie Berend performed the sonogram on February 28, 2005, and reported that the exam was unremarkable. (*Id.*)

Bradley was treated again by Dr. Atieh on March 23, 2005. (Tr. 183.) During this

---

1. A GAF rating of forty-one to fifty indicates "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (American Psychiatric Association, 4th ed. 2000).

examination, Dr. Atieh found Bradley's COPD, depression, and hypothyroidism to be stable. (Tr. 184.) Dr. Atieh rechecked Bradley on April 20, 2005, and diagnosed her with lower back pain, bipolar disorder, and allergies. (Tr. 181–82.)

On April 27, 2005, Bradley was rechecked again by Dr. Atieh. (Tr. 179.) At this time, Dr. Atieh again found Bradley's COPD to be stable and again noted her hypothyroidism. (Tr. 180.) Dr. Atieh, during the examination, also noticed pain and swelling in Bradley's hands, and referred her to Dr. Radkar for a consultation for carpal tunnel syndrome. (*Id.*)

Dr. Atieh, on March 29, 2005, submitted a letter indicating that Bradley is his patient and suffers from COPD, a condition which will last more than twelve months. (Tr. 201.) Then on June 16, 2006, after the hearing with the ALJ, he sent another letter adding that because of Bradley's COPD, she cannot "be engaged in any substantial gainful activity due to physical or mental impairments." (Tr. 229.)

Dr. Radkar saw Bradley, on April 29, 2005, for carpal tunnel syndrome. (Tr. 215.) Dr. Radkar noted Bradley's past medical history as "significant for COPD, hypothyroidism and questionable bipolar disorder." (*Id.*) An examination revealed discoloration at the knuckles and distal fingers. (Tr. 216.) Her distal feet were cool to touch and pulses were felt in both feet. (*Id.*) A mental exam noted that Bradley was "awake, alert, oriented times four." (*Id.*) Bradley was not in any distress, and her speech was fluent. (*Id.*) A motor exam indicated that Bradley showed 5/5 strength bilaterally in both the upper and lower extremities. (*Id.*) Dr. Radkar added that Bradley is able to rise from a seated position without difficulty, that her balance and stance are stable, and that she can turn without problems. (Tr. 217.) She can also perform heel to toe walking without difficulty. (*Id.*) Bradley has mild difficulty with tandem gait, and her Romberg is negative. (*Id.*)

Dr. Radkar also noted that additional testing showed positive Tinel's bilaterally, overall right greater than left. (*Id.*) She also has mild Tinel's at her left elbow. (*Id.*) After a discussion of Bradley's history and examination, Dr. Radkar found Bradley's symptoms to be consistent with carpal tunnel syndrome. (*Id.*) Dr. Radkar gave the Bradley wrist splints and recommended that she wear them at night, and "also in the daytime if it is not going to get in the way in any of her activities or work.." (*Id.*) A plain film of her cervical spine was ordered, and a follow-up was recommended in six weeks. (*Id.*)

Dr. Radkar treated Bradley again, on June 22, 2005, for a follow up. (Tr. 203.) Bradley reported that the wrist splints were helping her significantly, and that she wears them as much as possible during the day as well as at night. (*Id.*) Dr. Radkar, therefore, recommended that she continue wearing the wrist splints. (Tr. 204.) Also noted in his report, Dr. Radkar stated that "Overall, her neurological review of systems and examination today are unchanged from her previous visit." (*Id.*) Bradley also reported that she has back pain due to a fall. (*Id.*) As a result, Bradley claims to have a tingling sensation in her feet and numbness in her toes. (Tr. 203.) Dr. Radkar's examination revealed that her feet were mildly cool to touch and that she had small bruises in the anterior portion of the lower extremities that are not infected. (Tr. 204.) Bradley also had a decreased pulse in her right foot. (*Id.*) A plain film of her cervical spine, which was taken on April 29, 2005, was unremarkable. (*Id.*) Given her complaints about back pain, however, Dr. Radkar ordered a plain film of her lumbar spine and blood work. (*Id.*) Finally, he recommended that Bradley be evaluated by a Rheumatologist for stiffness of joints, and by a Gastroenterologist for diarrhea. (*Id.*) The plain film of Bradley's lumbar spine revealed mild degenerative changes at the L5-S1 level with grade one spondylolisthesis; however, the rest of the exam was unremarkable. (Tr.

207.)  A three view of Bradley's left shoulder was also unremarkable.  (*Id.*)

Dr. Atieh treated Bradley again on May 16, 2005.  (Tr. 219.)  Bradley complained of a thyroid problem.  Dr. Atieh gave her prescriptions for COPD and lower back pain.  (Tr. 220.)

On July 25, 2005, Dr. Atieh filled out a physician's statement form relating to Bradley's social security claim.  (Tr. 222.)  In response to a question measuring the extent to which Bradley can work, Dr. Atieh marked that she is unable to work because her disability is permanent.  (*Id.*)  On this form, Dr. Atieh indicated that Bradley was diagnosed with COPD and bipolar disorder.  (*Id.*)  He reports that her primary disabling diagnosis is COPD, for which she needs continued medical care and treatment.  (*Id.*)

### 3.  Hearing Testimony

At the hearing, Bradley and Clifton I. King, Jr. testified.  Mr. King is a vocational expert, who testified regarding Bradley's ability to work given her medical limitations.  During Bradley's testimony, she informed the court that she is currently on probation for a DWI and was previously convicted of drug possession.  (Tr. 235–36.)  Her testimony also established that she previously worked as a housekeeper for Econo Lodge, but left because she was not able "to do the job, the work that was expected for me to do in the time that was allowed for me to do it."  (Tr. 236.)  She also was a housekeeper at the Comfort Inn, Deluxe Inn, and Days Inn, but left for reasons other than her medical problems.  (Tr. 237–39.)  Bradley left another job as a towel feeder for National Linens Supply because the blowing dust and extreme heat made it difficult for her to breathe.  (Tr. 238.)  Additionally, Bradley quit her part time  job as counter help at Arby's because of concerns relating to her coughing around the food.  (Tr. 239–40.)  Finally, Bradley was paid to take care of her mother.  (Tr. 240.)  Currently, a friend helps support Bradley.  (*Id.*)  On a typical day she feeds the

fish, takes care of her dog, takes the garbage out, watches television, and cleans her apartment. (Tr. 241.) Bradley also does puzzles and plays Yahtzee with friends and family. (Tr. 243.)

> During the vocational expert's testimony, the ALJ posed the following hypothetical question:
>
> [I]f you would presume an individual of the same age, education and work experience as the Claimant, presume that the individual would be capable of lifting, carrying, pushing or pulling maximum of 20 pounds, 10 pounds on a frequent basis, the individual would not be able to work in temperature extremes, not be able to work in concentrated exposures to dust, chemicals, fumes or smoke, the individual would not be able to reach overhead, the individual would be limited to occasional stooping, crouching, kneeling, crawling and climbing, let's see with that hypothetical would that allow for the past work?

(Tr. 255–56.) In response to the hypothetical question, the vocational expert stated that those limitations would not allow for the past work of housekeeper, laundry worker II, or fast food worker. (*Id.*) The ALJ then asked the vocational expert if the same hypothetical would allow for other work. (*Id.*) The vocational expert stated that the hypothetical would allow for a job of Assembler, Plastic Hospital Products; Suture Winder; Laminator I; Photo Copy Machine Operator; and Deli Slicer. (Tr. 256.) The ALJ then further limited the hypothetical to prohibit working with the general public, but to permit working co-workers and supervisors. (Tr. 256–257.) The vocational expert stated that this limitation would have no effect. (Tr. 257.) The hypothetical was then again limited by the ALJ to prohibit work with food service products. (*Id.*) As a result of this restriction, the vocational expert testified that the jobs of Deli Slicer would be eliminated. (*Id.*)

Upon further questioning by Bradley's attorney, the hypothetical was changed to include a provision that the individual must lie down for one or two hours daily for a nap. (Tr. 257–58.) In this case, the vocational expert said that all jobs would be eliminated. (Tr. 258.) Bradley's attorney change the hypothetical again to include an individual who "suffers from a panic or anxiety attack, which requires that she sit quietly, take medication, and breathes [sic] slowly until it subsides." (*Id.*)

The vocational expert responded that, under such circumstances, all jobs would be eliminated. (*Id.*)

## C. Summary of ALJ's Findings

The ALJ found that Bradley met the insured status requirement of the Social Security Act through March 31, 2008. (Tr. 22.) She also had not engaged in substantial gainful activity at any time relevant to the ALJ's decision. (*Id.*) The ALJ found that Bradley has "severe" COPD, a history of tendinitis of the left shoulder, and mild degenerative changes of the lumbar spine with grade I spondyolisthesis. (*Id.*) These impairments were found to cause significant limitations on basic work activities and were classified as severe under the Regulations. (*Id.*) The ALJ, however, found that the evidence did not support Bradley's allegation that her chest pain and earaches were severe. (*Id.*) Moreover, the ALJ found that Bradley did not have a severe mental impairment because she had no more than mild limitations. (*Id.*)

The ALJ subsequently considered whether Bradley's impairments, individually or collectively, equaled one of the listed impairments. (*Id.*) After considering the listed musculoskeletal, respiratory system, and mental disorders, the ALJ concluded that Bradley's impairments did not meet the listed levels. (Tr. 23.)

Next, the ALJ considered Bradley's residual functional capacity ("RFC"). The ALJ determined that Bradley has the RFC

> to lift and/or carry and push and/or pull twenty pounds, ten pounds on a frequent basis. She can stoop, crouch, kneel, crawl, and climb occasionally. She cannot work in concentrated exposures to dust, chemicals, smoke, and fumes. She cannot reach overhead with the non-dominant arm. She cannot work in temperature extremes.

(Tr. 24.) In making this determination, the ALJ considered the evidence presented, Bradley's symptoms, and the extent to which these symptoms were consistent with the evidence. (*Id.*) The ALJ concluded that while Bradley's "impairments could reasonably be expected to produce the

alleged symptoms, . . . [Bradley's] statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." (Tr. 25.) After finding Bradley's symptoms not credible, the ALJ analyzed the medical evidence. (*See id.*) The ALJ noted that the consultative examiner determined that claimant was not able to lift objects weighing more than five to ten pounds and was only able to stand for thirty minutes to one hour. (Tr. 26.) The ALJ noted that these limitations were based on Bradley's history, not on clinical and laboratory findings. (*Id.*) Accordingly, these limitations were given reduced weight. (*Id.*)

Bradley's treating physician, Dr. Samir Atieh, wrote a letter on March 29, 2005, which the ALJ considered. (Tr. 26–27.) In this letter, Dr. Atieh stated that Bradley had COPD, which required continuous treatment. (Tr. 26.) Because this letter did not contain clinical or laboratory findings to support this assertion, the ALJ gave reduced weight to this letter. (Tr. 26–27.)

The ALJ also considered the State agency's reviewing physician's findings. (Tr. 27.) Those findings concluded that Bradley could do light work with limited reaching in the left arm. (*Id.*) The reviewing physician's based this finding on the consultative examiner's report. (*Id.*) The ALJ also noted that a neurologist found normal strength and extremity movement. (*Id.*)

In light of the evidence and testimony, the ALJ ultimately included limitations in Bradley's RFC for her COPD and/or bronchitis and her inability to reach overhead with her left arm. (*Id.*) After determining Bradley's RFC, the ALJ decided that Bradley was unable to perform any past relevant work. (*Id.*) The ALJ noted that Bradley's past jobs were "performed at the light to medium exertional level, and some were performed in environments with temperature extremes and/or exposure to chemicals, dust and fumes, which is precluded by her residual functional capacity." (*Id.*)

The ALJ then considered Bradley's age, education, work experience, and RFC to determine if she could perform other jobs. Bradley is defined as a younger individual (ages eighteen through forty-four) until August 17, 2003. (*Id.*) She is now considered to be a younger individual (ages forty-five through forty-nine). (*Id.*) Bradley has a high school education and can communicate in English. (*Id.*) The ALJ also determined that the transferability of job skills was not an issue because Bradley's past work was unskilled. (*Id.*) Given this evidence and the testimony of the vocational expert, the ALJ concluded that Bradley has the capacity to adjust to other work, including an assembler of plastic hospital products, a deli slicer, a photo copy machine operator, a suture winder, and a laminator. (Tr. 28.) These jobs exist in significant numbers in the economy. (*Id.*) The ALJ, therefore, determined that Bradley is not disabled.

## II. Analysis

### A. Standard of Review

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes the individual from performing the individual's past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. If the claimant cannot perform past work, the burden shifts to the Commissioner in step five to prove the claimant is able to perform other substantially gainful activity. *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38

F.3d at 236.

**B. Issues for Review**

Bradley argues that ALJ's RFC finding is not supported by substantial evidence. More specifically, Bradley claims that the ALJ, in determining the RFC, failed to take into account or give proper weight to the following: (1) Dr. Samir Atieh's March 29, 2005 letter; (2) Bradley's need to wear wrist splints both night and day; (3) the side effects of medication; (4) Bradley's need to nap one to two hours daily; (5) Dr. Samuel Ajumobi's diagnosis; and (6) Dr. Hector Decena's mental diagnosis.

### 1. Dr. Samir Atieh's March 29, 2005 Letter

Bradley first argues that the ALJ's failure to give controlling weight to Dr. Atieh's letter, dated March 29, 2005, because of the lack of supporting laboratory findings and the lack of continuous treatment was improper. (Pl.'s Br. 14.) Bradley contends that the medical evidence in the record shows that she sought treatment for COPD three to four times a year, and that the doctor usually found a cough and wheezy breathing sounds. (Pl.'s Br. 15.) The Fifth Circuit has held that "written reports by physicians who have examined the claimant setting forth medical data are admissible in evidence in a disability hearing and may constitute evidence supportive of findings by hearing examiners." *Loza*, 219 F.3d at 395. Moreover, the Fifth Circuit has also found that medically acceptable evidence is not limited to laboratory findings or test results, but also includes observations made by a doctor during a physical examination. *Id.* However, as was noted by the ALJ, opinions of treating physicians concerning the nature and severity of the impairments are given controlling weight only when supported by credible evidence. *Id.* Dr. Atieh's March 29, 2005 letter states:

To whom it may concern:

LuAnn Bradley is a patient of mine at the Family Health Center. This patient has a chronic condition called COPD (Chronic Pulmonary Obstructive Disease) which lasts more than 12 months. Ms. Bradley needs continuous care and treatment. If you have any questions please do not hesitate to call me at the clinic . . .

Thank You,

Samir Atieh, M.D.

(Tr. 201.) This letter does not set forth any medical data. It does not specifically refer to any laboratory findings or test results. It does not allege any restrictions Bradley faces as a result of this condition. It does not include observations made by Dr. Atieh during Bradley's examination. It merely provides Dr. Atieh's diagnosis and his opinion that the condition will last for more than twelve months and require continuous care and treatment. The ALJ also noted a lack of continuous treatment. Accordingly, the ALJ found this statement to be of little value, and did not afford it controlling weight.

Bradley incorrectly argues that the ALJ dismissed Dr. Atieh's letter solely because of the results of Bradley's pulmonary function test. The ALJ uses the results of Bradley's pulmonary function test as an example to illustrate that not only does the letter not provide any clinical or laboratory findings, but the actual clinical and laboratory findings do not necessarily support Dr. Atieh's letter. Bradley claims that the pulmonary function test does in fact support Dr. Atieh's letter. Bradley claims that she "is only .22 hundredths from achieving listing level for COPD," and that "[a]nyone who meets the listing, or is close to the listing, is in bad shape." (Pl.'s Br. 15.) It appears that Bradley, in making this assertion, mistakenly relied on 20 C.F.R. § 404 (P), app. 1, Listing 3.04(A). Listing 3.04(A) is applicable only for evaluating cystic fibrosis, not COPD, which is at issue in this case. Instead, 20 C.F.R. § 404 (P), app. 1, Listing 3.02 (A), is the appropriate guide

when evaluating COPD. According to 3.02(A), COPD is only considered disabling if the patient's $FEV_1$ is equal to or below the listed level. The measuring $FEV_1$ for a person of Bradley's height, 59.8 inches, is 1.05. 20 C.F.R. § 404 (P), app. 1, Listing 3.02 (A); (Tr. 145). Bradley's 1.67 $FEV_1$ is more than ".22 hundredths from achieving listing level for COPD." (Pl.'s Br. 15); (Tr. 145.) Moreover, it was unnecessary to administer a bronchodilator and repeat spirometry because Bradley's pre-bronchodilator $FEV_1$ was seventy-three percent of the predicted normal value. *See* 20 C.F.R. § 404 (P)(1)(E) ("Spirometry should be repeated after the administration of an aerosolized bronchodilator . . . if the pre-bronchodilator FEV sub 1 value is less than 70 percent of the predicted normal value."). Likewise, Bradley 's FVC, 2.32, is above the 1.25 level required to find a person disabled by chronic restrictive ventilatory disease. 20 C.F.R. § 404 (P), app. 1, Listing 3.02(B). Therefore, the ALJ's use of the pulmonary function test to show that the clinical or laboratory findings did not necessarily support Dr. Atieh's letter was proper.

Moreover, Bradley argues that because the record shows Bradley received continuous care and treatment for COPD, the ALJ was incorrect to reduce the weight of the letter based on lack of continuous treatment. The ALJ's decision regarding lack of continuous treatment is also supported by substantial evidence. As of March 29, 2005, the date of Dr. Atieh's letter, Dr. Atieh had only seen Bradley two times. The first was on February 21, 2005 when he diagnosed Bradley with COPD. The second was on March 23, 2005 when he determined that Bradley's COPD was stable. The two meetings indicate a lack of continuous treatment by Dr. Atieh, and the fact that Dr. Atieh found Bradley's COPD to be stable six days before writing the letter supports the ALJ's decision to give Dr. Atieh's letter reduced weight.

The ALJ notes that other people have impairments that require care and treatment, but still

work.  (Tr. 27.)  While the ALJ decided to give little weight to the letter, and pointed out that

Bradley does not meet the listed requirement, the ALJ did find that other evidence regarding

Bradley's COPD warranted including limitations in her RFC.  In other words, while the letter itself

was not used in deciding Bradley's RFC, Dr. Atieh's diagnosis of COPD was ultimately accepted,

and was found to be severe.  As a result, the RFC included limitations that Bradley was unable to

work in concentrated exposures to dust, chemicals, smoke, and fumes, or in temperature extremes.

Accordingly, the ALJ's decision to give reduced weight to Dr. Atieh's March 29, 2005 letter is

supported by substantial evidence.[2]

### 2.  Wrist Splints

Bradley also claims that the ALJ erred by not including limitations in her RFC for wearing

wrist splints during the day and at night.  (Pl.'s Br. 15.)  The ALJ considered this complaints, but

determined that the allegation of significant limitations in the ability to work as a result of this

impairment was not credible.  (Tr. 26.)  The Court finds that this decision is supported by substantial

evidence.

Bradley was referred to Dr. Radkar, a neurologist, for an evaluation of carpal tunnel

syndrome on April 29, 2005.  (Tr. 215.)  She complained that her hands turn black and blue when

it is cold.  (*Id.*)  She also reported pain and numbness between the knuckles.  (*Id.*)  Bradley claims

---

2.  Dr. Atieh sent another letter on June 16, 2006, after the hearing was held before the ALJ. This letter adds one sentence stating: "[Bradley] can't be engaged in any substantial gainful activity due to physical or mental impairments."  The remainder of the letter is identical to the March 29, 2005 letter.  The letter provides no further evidence and only provides an opinion on the ultimate decision of whether Bradley is disabled.  While opinions from treating physicians should be "afforded considerable weight in determining disability, 'the ALJ has sole responsibility for determining a claimant's disability status.'"  *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  For this reason and reasons similar to the March 29, 2005 letter, the June 16, 2006 letter provides little value to the fact finder.

that she occasionally drops items in the kitchen and cannot lift heavy pots and pans. (*Id.*) She also told Dr. Radkar that she is stiff all over when she wakes up, but that this improves as the day progresses. (*Id.*) After conducting an exam, Dr. Radkar noted, based on history and exam, that Bradley's impairments are consistent with carpal tunnel syndrome. (Tr. 217.) Dr. Radkar recommend that she wear the wrist splints at night and "also in the daytime if it is not going to get in the way in any of her activities or work." Thus, there is no requirement or even a recommendation that Bradley wear the wrist splint at all times. There is also no indication that Bradley is unable to work because of this impairment.

A follow up examination was conducted by Dr. Radkar on June 22, 2005. (Tr. 203.) During this exam, Bradley reported that the wrist splints helped her significantly. (*Id.*) She wears them at night and as much as possible during the day. (*Id.*) The Commissioner correctly notes that on Bradley's disability documents she stated that on an average day she dusts, straightens out drawers, washes dishes, waters the plants, feeds the dog, and sweeps the floor. Accordingly, Bradley does not wear the wrist splits at all times and can still do work. After considering the medical evidence and Bradley's daily activities, the AJL found Bradley's allegation that the wrist splints caused significant limitations not credible. The ALJ's decision, therefore, not to include a limitation for Bradley wearing wrist splints is supported by substantial evidence.

### 3. Medication Side Effects

Likewise, the ALJ's decision not to include a limitation in Bradley's RFC for medication side effects is also supported by substantial evidence. Bradley does not provide any examples of medicines that cause side effects. She also does not allege that any of the side effects cause problems with her daily activities or work. After reviewing the evidence, Dr. Radkar does note on

April 29, 2005, that Bradley stopped taking Depakote and Zoloft due to nausea, but there is no indication of any continuing problems. (Tr. 213.) Therefore, the ALJ's decision not to include limitations in Bradley's RFC for side effects from medication is supported by substantial evidence.

### 4. Napping One to Two Hours

Bradley also alleges that she must nap one to two hours daily because of headaches and medications. (Pl.'s Br. 15.) The only evidence in the record about napping because of headaches and medications is Bradley's own testimony at the hearing. (Tr. 250–51.) The ALJ must consider subjective complaints, but the ALJ can use objective medical evidence to determine if claimant's complaints are credible. *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985). Bradley does not point to any medical evidence supporting this assertion, nor does she show that any of her doctors recommended or required her to nap one to two hours daily. There is also no indication that Bradley told her doctors that her headaches and medications make her tired. After weighing Bradley's complaints with the medical evidence, the ALJ concluded that Bradley's "statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible," and therefore, did not include such limitation in Bradley's RFC. (Tr. 25.) The ALJ did not err in this regard.

### 5. Dr. Samuel Ajumboi's Diagnosis

Bradley next argues that the ALJ improperly disregarded the report of Dr. Samuel Ajumobi, a non-treating physician employed by the Texas state disability determination agency. (Pl.'s Br. 15.) The ALJ, according to Bradley, ignored Dr. Ajumboi's opinion because the ALJ believed it was based only on Bradley's history. (Pl.'s Br. 15–16.) Bradley claims that the opinion was in fact based on Dr. Ajumboi's examination. The only support Bradley provides for this argument, is that Dr. Ajumboi could not have determined that her range of motion was limited to thirty degrees in

abduction without examining Bradley. (Pl.'s Br. 16.) The ALJ, however, did not disregard Dr. Ajumboi's opinion regarding Bradley's ability to use her left arm. The ALJ specifically relied on Dr. Ajumboi's reports when she included a limitation in Bradley's RFC for not being able to reach overhead with her left arm. (*See* Tr. 27.) The ALJ stated that

> "[t]he State agency's reviewing physicians found that the claimant could do light work with limited reaching with the left arm. This was based on the consultative examiner's reports of limited upper extremity strength and limited movement of the left arm. The consultative examiner did not comment of the claimant's effort. A neurologist later found normal strength and extremity movement."

(Tr. 27.) Therefore, despite Dr. Radkar's finding of normal strength, the ALJ did in fact find that Bradley had trouble reaching overhead with her left arm, and included such a restriction in Bradley's RFC. (Tr. 24, 27.) Bradley also appears to claim that the ALJ ignored Dr. Ajumboi's assessment that Bradley has COPD and bronchitis, but as discussed above, the ALJ included limitations for COPD and bronchitis in Bradley's RFC.

In fact the only portions of Dr. Ajumboi's opinion that the ALJ gave reduced weight because the limitations were based on Bradley's history and not on examination were to his findings that (1) Bradley could not lift objects weighing more than five to ten pounds, (2) Bradley's standing was limited to thirty minutes to one hour, and (3) Bradley was limited to walking one to two blocks. The evidence substantially supports this finding. In Plaintiff's history, she reports to Dr. Ajumboi that she could not lift more than five to ten pounds and that she is currently able to walk only one to two blocks. (Tr. 141.) Moreover, other evidence, including Dr. Ajumboi's report, contradicts these conclusions. Dr. Ajumboi's examination shows that Bradley's straight leg raising test was negative, palpation of the cervical ribs revealed no tenderness of the muscles bilaterally, palpation of the thoracic spine and paraspinal muscles was non tender, and there was only moderate tenderness along

the paraspinous muscles bilaterally on palpation of the lumbar spine. (Tr. 143.) Further, Bradley's lower extremities have normal range of motion, and there are no deformities tenderness or swelling in the joints. (*Id.*) There was no edema of the lower extremities and no cyanosis or clubbing (*Id.*) Bradley's posture is erect, and her spine is straight. (*Id.*) She has 4/5 muscle strength in both lower extremities. (*Id.*) While her tandem gait was unstable and she performed heel to toe walking with some pain, her gait was grossly coordinated. (*Id.*) Dr. Ajumboi also found that Bradley had no muscle atrophy. (*Id.*)

Other evidence also contradicts these conclusions. For instance, Dr. Radkar found that Bradley performed heel to toe walking without difficulty, that she only had mild tandem gait, and her Romberg was negative. Dr. Radkar also noted that a plain film of her cervical spine was unremarkable. (Tr. 204.) Moreover, Bradley was able to arise from a seated position without difficulty. (*Id.*) Her balance and stance were stable and she was able to make turns without difficulty. (*Id.*) Therefore, the medical examinations conducted by both Dr. Ajumboi and Dr. Radkar support the ALJ's decision to give reduced weight to these findings because they are based on Bradley's history and contradicted by other evidence.

Bradley also claims that the ALJ disregarded Dr. Ajumboi's assessment that Bradley had back pain for five years. (Pl.'s Br. 15.) This was also reported in Bradley's history. (Tr. 141.) In Bradley's history she admits that the back pain is minimal, but claims that it radiates to the leg. (*Id.*) Bradley also reports in her history that the back pain is relieved with medication and sitting down. (*Id.*) As stated above, the physical examination conducted by Dr. Ajumboi shows that the palpation of the cervical ribs reveals no tenderness of the muscles, palpation of the thoracic spine and paraspinal muscles is nontender, and on palpation of the lumbar spine, there is only moderate

tenderness along the paraspinous muscles bilaterally. (Tr. 143.) Dr. Ajumboi also found that Bradley had normal range of motion in her lower extremities. (*Id.*) Therefore, while Dr. Ajumboi assessed Bradley with back pain for five years, there is no indication from the medical evidence, nor Bradley's self reported history, that it is severe. Accordingly, the ALJ's decision not to include a restriction in Bradley's RFC for back pain is supported by substantial evidence.

### 6. Dr. Hector Decena's Mental Diagnosis

Bradley raises two issues regarding the ALJ's findings about Bradley's mental impairments. First, Bradley argues that the ALJ improperly disregarded Dr. Decena's diagnosis of the presence of mental impairments. (*See* Pl.'s Br. 17–20.) Second, Bradley claims that the ALJ failed to assess Bradley's mental RFC, despite having found Bradley's mental impairments to be severe. (Pl.'s Br. 20–21.)

First, Bradley spends significant time arguing that the ALJ did not give proper weight to Dr. Decena's mental diagnosis. Bradley complains that the ALJ dismissed her mental diagnosis, relying on Dr. Radkar's opinion that Bradley had "questionable" bipolar disorder and the ALJ's own belief that this disorder may have been created to generate evidence for the appeal. (*See* Pl.'s Br. 17–20.) However, while the ALJ does note in her opinion that Bradley's bipolar disorder is questionable given the opinion of Dr. Radkar and the timing of the discovery of the disorder, the ALJ nonetheless, accepted Dr. Decena's diagnosis and stated that Bradley "meets the 'A' criteria for a listed mental disorder." (Tr. 23.) In other words, the ALJ accepted that Bradley had sufficiently demonstrated the presence of a mental disorder.

After arguing in depth that the ALJ did not properly recognize Bradley's mental disorder, Bradley then claims that the ALJ found that Bradley in fact had "severe" depression with mild

limitations, and therefore, should have assessed Bradley's mental RFC. (*See* Pl.'s Br. 20–21.) This argument, however, misrepresents the ALJ's opinion. An RFC assessment does not have to be made unless the ALJ determines that the claimant's mental impairments are severe. *Stone v. Heckler*, 752 F.2d 1099, 1102 (5th Cir. 1985). In this case, the ALJ found while Bradley has mental impairments, "the claimant does not have more than 'mild' limitations, and her mental impairments are *not* severe." (Tr. 24 (emphasis added).)

The Court's role is to determine whether substantial evidence supports the ALJ's finding that Bradley's mental impairments is not severe. An impairment is not severe if "it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone*, 752 F.2d at 1101. Bradley has the burden of proving that her mental impairments are severe. *Greenspan v. Shalala*, 38 F.3d 232, 236–37 (5th Cir. 1994). Bradley fails to point to any evidence demonstrating that her mental impairments interfere with her ability to work. Instead, Bradley argues that, under *Loza v. Apfel*, 219 F.3d 378 (5th Cir. 2000), if an impairment is determined to be severe, it "by definition would impose functional limitations." (Pl.'s Br. 20.) The Court disagrees with this interpretation of *Loza*. In order to initially be found to have a severe impairment, it must have more than a "minimal effect on the individual . . . [so] that it would . . . be expected to interfere with the individual's ability to work." *Loza*, 219 F.3d at 391. In other words, the claimant must first show that the impairment would be expected to impose functional limitations, before that impairment is found to be severe. The Fifth Circuit, in *Loza*, did not automatically assume functional limitations. Instead, the court fully analyzed the claimant's social functioning and activities. *Id.* at 397–98. The evidence showed that the claimant has "phobic trends," refuses to

enter a theater when other people are present, has difficulty handling marital conflicts, is angered easily, has a dysfunctional relationship with his daughter, hit his son, is unable to participate in group therapy, has only one friend who is a neighbor, has limited contact with his mother, and is withdrawn from his two brothers and seven sisters. *Id.* The evidence also showed that he has hearing loss, an inability to concentrate, and hallucinations. *Id.* After reviewing the record as a whole, the Fifth Circuit determined that substantial evidence did not support the ALJ's conclusion that the claimant was only slightly limited by his mental impairment. *Id.* at 399.

Likewise, Bradley must prove that her mental impairments are severe by showing that such impairments have more than a minimal effect on her and would be expected to interfere with her ability to work. *See Greenspan v. Shalala*, 38 F.3d 232, 236–37 (5th Cir. 1994). Bradley fails to point to any evidence demonstrating that her mental impairments interfere with her ability to work. Instead, Bradley points to the fact that Dr. Decena found her GAF rating to be at forty-seven, and that it was previously at fifty-five. (Pl.'s Br. 20.) She claims that because of this rating, it should be assumed that her impairments affect her ability to work.

The Fifth Circuit, in *Boyd v. Apfel*, 239 F.3d 698 (5th Cir. 2001), found that there was no substantial evidence supporting the decision that claimant's mental impairments were not severe when the evidence showed the claimant had a GAF rating of fifty. *Id.* at 702. However, the court in that case did not rely only on the GAF rating, and did not assume functional limitations. *See id.* at 707. The other evidence in that case showed that the claimant suffered from delusions, had little social or familial interaction, could not manage his own finances, exhibited few adaptive coping skills, had poor or no ability to deal with work stresses or function independently, had frequent deficiencies in memory, concentration, persistence, and pace. *Id.* at 702–03, 707. Unlike *Boyd*, the

other evidence in this case does not show social impairments or an inability to care for herself. Bradley lives alone in her apartment. (Tr. 234.) She sweeps, feeds the fish, takes care of her dog, prepares food, goes to the grocery store, watches television, does puzzles, plays Yatzee with friends, and visits her son and grandchildren. (Tr. 241–43.) Moreover, Bradley interacts well with others and maintains relationships with friends and family. (*Id.*) Dr. Decena noted that Bradley was "oriented to all three spheres . . . [her] memory appeared to be intact . . . [she functioned] in the average range of intelligence. Concentration was fair. Insight and judgment were intact." (Tr. 164.) This evidence of Bradley's daily activities and social functioning differs drastically from that of the claimant's in *Boyd*, and it does not support Bradley's assertion that her mental impairments are severe. Further, it is not the Court's role to re-weigh the evidence. *See Greenspan*, 38 F.3d at 236. Accordingly, the Court finds that, based on a review of the entire record, substantial evidence supports the ALJ's finding that Bradley does not have severe mental impairments because her impairment does not, nor would it be expected to, interfere with her ability to work.

### Conclusion

After extensive review of the record in this case, this Court finds that substantial evidence supports the Commissioner's decision. For the reasons stated above, the final decision of the

Commissioner is affirmed.

**SO ORDERED**.  November 19, 2007.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE